WINNETKA BANK, as Trustee, Plaintiff-Appellant, v. PETER MANDAS
*et al.*, Defendants-Appellees.
First District (5th Division)   Nos. 1—88—1848, 1—88—2032 cons.

Opinion filed August 17, 1990.

374

Phillip E. Couri, of Court & Economos, of Winnetka, for appellant.

Thomas M. Bastian, of Storino, Ramello & Durkin, of Des Plaines, for appellees.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

Plaintiff, the Winnetka Bank, as trustee under trust No. R—576 (the Bank), appeals from two orders of the circuit court favorable to defendants, Peter and Bill Mandas, in an action by the Bank to recover damages for breach of an unexecuted commercial lease agreement. Issues presented relate to (1) the enforceability of the unexecuted lease within the provisions of the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1 *et seq.*) and (2) whether plaintiff, in its veri-

fied pleadings, made judicial admissions which preclude its recovery, in the alternative, for defendants' alleged breach of a prior, executed lease agreement.

On September 5, 1985, when the Bank filed its original complaint, it was legal title holder to the leased property, which it had acquired in January 1985 from the La Salle National Bank, the previous trustee for the beneficial interest holders. The record reveals that defendants, who are brothers, operated a restaurant, the "Mandas Snack Shop," on the subject premises for approximately 26 years prior to this lawsuit, as tenants under a series of signed and unsigned term leases.

In its verified complaint, the Bank alleged that in January 1985, defendants were occupying the premises under the terms of a written lease agreement. The Bank further alleged that "on or about the first of March, 1984, Plaintiff, through its agent, and at Defendant's [sic] request, agreed to rewrite Defendant's [sic] lease agreement, thereby cancelling the balance of the existing lease agreement." The complaint further stated that defendants, "pursuant to the terms of the new lease agreement," leased the premises for a five-year term beginning April 1, 1984, and ending April 30, 1989, and occupied the premises until August 31, 1985, a period of 17 months, under the terms of the new lease (hereafter, the 1984 lease). It was further alleged that "on or about July 29, 1985, Defendants served written notice on Plaintiff that they intended to terminate their lease agreement on August 31, 1985," and that the termination notice was served "with the lease agreement attached to it." A copy of defendants' notice of termination, as well as a copy of a seven-page unexecuted written lease, stating a lease term of April 1, 1984, through April 30, 1989, and a gross rent of $183,000, payable in $3,000 monthly installments, were attached to the verified complaint. The complaint requested damages of $132,000 in rent for the remainder of the lease term, and a portion of the real estate taxes on the property pursuant to a provision of the 1984 lease, for a total of $190,000, plus interest and costs of the lawsuit.

In their verified answer to the Bank's original complaint, defendants alleged as an affirmative defense that they entered into a store lease with the title holder of the premises on or about October 1, 1980, for a term ending September 30, 1985 (hereafter, the 1980 lease) and that they occupied the premises "under the terms of that lease" from October 1, 1980, to August 31, 1985. While denying nearly every allegation in plaintiff's complaint, including that "the document attached to Plaintiff's Complaint [the 1984 lease] *** con-

stitute[d] a lease agreement between the parties," defendants admitted that they "served written notice of termination of tenancy on Plaintiff on July 29, 1985." Defendants' answer includes neither an admission nor a denial of the allegation that defendants' termination notice was served on plaintiff with the 1984 lease attached.

It is undisputed that defendants vacated the subject premises by August 31, 1985, and immediately opened a new restaurant across the street. It is also undisputed that the City of Des Plaines (the City) initiated condemnation proceedings against the subject property soon thereafter and obtained a condemnation judgment in March 1987. In oral argument before this court, the parties conceded that no damages relating to the period after March 1987 are being sought or contested in this action. Thus, the issues addressed in this opinion relate to the alleged liabilities of defendants arising from either the 1984 or the 1980 lease agreement with plaintiff and extending up to the date of condemnation.

Contained in the record on appeal are three written leases between plaintiff's predecessor in interest, "La Salle National Bank as Trustee, Philip G. Prassas, Agent," and the defendants. All of the leases are printed "Cole Legal Forms" store leases, with typewritten amendments and riders. They are nearly identical in format and contain, for the most part, nearly identical provisions. The leases vary primarily in the dates of the lease terms and the monthly rent provisions. The first lease states a lease term of October 1, 1979, through September 30, 1984, and a monthly rent of $2,300. The lessees are listed as Peter Mandas, Bill Mandas, and Stella Mandas. While the lease includes prepared signature lines for all three lessees and for Philip Prassas, as lessor's agent, the document is completely unexecuted. Neither plaintiff nor defendants claim that this lease was in effect at any time relevant to this lawsuit. It does, however, serve to illustrate the history of dealings between the parties.

The second lease (the 1980 lease) states a term of October 1, 1980, through September 30, 1985. The monthly rent is $2,500. Peter and Bill Mandas are listed as lessees, the name of Stella Mandas has been crossed out, and the deletion of Stella's name has been initialed by Prassas, Peter Mandas and Bill Mandas. The lease is fully executed by all three parties. In addition, the 1980 lease, like its predecessor, contains a Consumer Price Index (CPI) adjustment clause. This provision in part states:

> "The basic monthly payments shall be subject to automatic adjustment after September 30, 1981, based on changes in the Consumer Price Index ***. The Lessee hereto agrees to pay in-

creased rental proportional to any increases in the CPI, *** as follows: *** [b]eginning October 1, 1980, the annual rental shall be increased if the percentage listed in the CPI increases for the preceding year. The adjustment in the CPI shall be computed using a (12) month period ending June 30 each year."

The 1980 lease also requires the lessee to carry insurance, in certain specified amounts, for death or personal injury on the premises, single accident coverage, and property damage with respect to the subject premises. It also requires the lessee to carry plate glass insurance. The lessee is further required to deposit with lessor, within 10 days from the beginning date of the lease term, a certificate showing that such insurance is in force. With regard to real estate taxes, the 1980 lease provides that the lessee shall reimburse the lessor "on a pro-rata basis according to his store's percentage of square foot area in relation to the total square foot area of the premises for any real estate taxes in excess of that charged against the property for the year 1978." Finally, the 1980 lease contains an "Option to Renew" clause (hereafter, reverse option clause) which becomes significant in the context of the current dispute. The reverse option clause provides:

"Lessee shall have the right to renew this lease for a period of five (5) years under the same terms and conditions except that the annual rental shall be the current rental then in existence plus any CPI increase for said period. *Said option shall be deemed exercised unless Lessee gives Lessor written notice of his intent not to exercise said option no later than 180 days prior to expiration of the lease contract.*" (Emphasis added.)

The third lease is the unexecuted 1984 lease upon which the Bank based its original complaint. This document is dated March 22, 1984, and states a five-year lease term, from April 1, 1984, through April 30, 1989. The gross monthly rental fee is $3,000. Peter and Bill Mandas are listed as sole lessees. The provisions for insurance coverage, including plate glass insurance, are identical with those of the 1980 lease, as are the real estate tax provisions. However, the CPI adjustment, under the 1984 lease, would be effective at the lessor's option, and only in the event that the lessee failed to undertake and complete "substantial remodeling" within 90 days from the beginning of the lease term, *i.e.*, April 1, 1984. The provision further states that the lessee agrees to undertake this remodeling and upgrading of the premises "in consideration of Lessor giving Lessee a flat-rate gross rent and the elimination of CPI rental adjustment." Other differences between the 1980 and 1984 leases are irrelevant to the issues before us.

In response to defendants' verified answer and affirmative defense, the Bank filed a motion for summary judgment as to liability. Plaintiff's motion was based on the reverse option clause of the 1980 lease, the effect of which was to automatically renew that lease for another five-year term in the event that the lessees failed to notify the lessor in writing, within 180 days of its expiration date, of their intention not to renew the lease. Plaintiff's motion was supported by the sworn affidavit of Philip Prassas, in which Prassas stated that he, as plaintiff's agent, never received the required written notice of defendants' intent not to renew the 1980 agreement.

In defendants' response to plaintiff's summary judgment motion, they again admitted that they entered into the 1980 lease, but denied nearly all of plaintiff's allegations relating to liability under that lease. They also filed the sworn counteraffidavit of Peter Mandas, in which Mandas stated that on or about April 1, 1984, Prassas and defendants entered into negotiations for a new lease agreement, and that Prassas and defendants "terminated the lease agreement dated October 1, 1980, and entered into a new lease agreement," described as an oral lease, by which Prassas agreed to accept monthly rental payments of $3,000. The affidavit further states that beginning on or about April 1, 1984, and for each subsequent month until August 1, 1985, Prassas accepted payment of $3,000 in rent. Finally, the Mandas affidavit states that "on or about April 1, 1984, the time of executing the *** oral lease agreement," he informed Prassas of the defendants' intent not to renew the 1980 lease.

By agreement of the parties, defendants were also granted leave to file a verified amended answer to the Bank's complaint. The amended answer alleged two additional affirmative defenses, mirroring the statements in defendants' response to plaintiff's summary judgment motion. Defendants alleged that: (1) on or about April 1, 1984, plaintiff and defendants "terminated" the 1980 lease and "entered into an oral lease at a rental amount of $3,000 per month"; and (2) plaintiff, on or about April 1, 1984, knew that defendants intended not to renew the 1980 lease.

On February 28, 1986, the trial court denied the Bank's motion for summary judgment, specifically finding that there existed material issues of fact and that the motion was premature. Subsequently, on March 14, 1986, defendants filed a verified countercomplaint against the Bank. The countercomplaint states that "in the event and only in the event" that the 1980 lease is held to be in force and effect, defendants allege: (1) that they were lessees under the terms of a lease dated October 1, 1980, by which they were obligated to pay

$2,500 per month; (2) that on or about March 1984, they entered into negotiations with plaintiff for a new lease; (3) that while negotiations were going on, defendants "commenced paying" $3,000 per month to Philip Prassas; and (4) that "efforts to execute a new written lease for the *** premises failed." Defendants further requested damages of $8,500, based upon the amount overpaid under the 1980 lease, together with interest and costs.

In May and June 1986, the Bank filed two verified amended complaints, adding the City of Des Plaines as a party defendant. The matters in controversy between the Bank and the City have been fully settled and are not germane to the issues raised in this appeal. However, we note that in their "Verified Answer to the Plaintiff's [Amended] Complaint," defendants again stated that they occupied the premises under the terms of the 1980 lease from October 1, 1980, to August 31, 1985.

On June 23, 1987, following further discovery and settlement negotiations between the Bank and the City, defendants moved for summary judgment against the Bank (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005), raising for the first time the defense that the 1984 unsigned lease agreement falls within the prohibition of the Statute of Frauds. In their motion, defendants directed the court's attention to the discovery deposition of Philip Prassas, taken on December 15, 1986, in which Prassas unequivocally stated that, although he mailed a copy of the 1984 lease to defendants for their signatures, neither he nor they ever signed the 1984 lease. The record also contains separate sworn affidavits of Bill Mandas and Peter Mandas, both dated June 16, 1987, in which each defendant stated that, at "no time relevant hereto," did he "agree to a five-year lease or sign or execute a written lease agreement for a term commencing April 1, 1984 and terminating April 30, 1989." Additionally, the affidavit of Peter Mandas stated that, "at all times relevant hereto [he] paid rentals on a monthly basis to Philip J. Prassas, in the amount of $3,000 per month."

Plaintiff, on July 15, 1987, filed its reply to the summary judgment motion, arguing the existence of a material issue of fact and the preclusion of the application of the Statute of Frauds on several grounds. It also supplemented its legal memorandum in opposition to defendants' motion with a number of writings and documents, to be discussed further below, which purportedly evidence both the communications between the parties relating to the unexecuted 1984 lease and the existence of a sufficient written memorandum to satisfy the Statute of Frauds.

After hearing arguments of counsel, circuit court judge Daniel M. Locallo, on July 31, 1987, entered an order granting defendants' motion and specifically finding that, "as a matter of [l]aw, the Lease agreement dated March 22, 1984, is unenforceable, due to the Statute of Frauds." The same order also granted a motion by plaintiff to amend its prayer for relief.[1] Subsequently, plaintiff filed its final pleading, a "Verified Second Amended Complaint," based on the 1980 lease, which requested unpaid rent, a *pro rata* share of the real estate taxes on the property for the tax years 1984 and 1985, interest and costs. The second amended complaint alleged that, after allowing for credits and setoffs, defendants owed the Bank the sum of $79,635.41 as a result of defendants' liability under the 1980 lease, through the "end of March 1987," when the condemnation judgment against the property "terminated the lease agreement."

On January 19, 1988, defendants filed a motion to dismiss the Bank's second amended complaint. (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(9).) Defendants' motion asserted that the Bank had made what were effectively "judicial admissions," in its prior verified pleadings, that the 1980 lease had been cancelled and that defendants had occupied the premises under a new lease agreement for 17 months. Specifically, defendants called attention to the Bank's allegation that "on or about March 1, 1984, plaintiff, through its agent, and at defendant's request, agreed to rewrite defendant's lease agreement, *thereby cancelling* the balance of the existing lease agreement." (Emphasis added.) Defendants further argued that plaintiff was now seeking to impose liability under a lease that plaintiff had described in three verified pleadings as having been cancelled by the parties, that plaintiff's judicial admissions removed the existence of the 1980 lease from controversy, and that plaintiff's entire complaint should be dismissed with prejudice.

Both parties having filed memoranda in support of their positions, Judge Rosaland M. Crandell heard arguments on May 16, 1988. Plaintiff was unsuccessful in persuading the court that it had agreed only to "write" a new lease, with an enforceable new lease being the consideration for cancelling the lease then in force, and that it had nowhere admitted a unilateral, unequivocal cancellation of the 1980

---

[1]Plaintiff also moved the court to amend the July 31, 1987, order to include a statement that there was no just reason for delaying enforcement or appeal of that order. Plaintiff's motion was denied. Plaintiff nonetheless took an appeal of the order to this court under Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)). That appeal was dismissed on November 12, 1987, on grounds that the order appealed from was not a final and appealable order. Case No. 1—87—2736.

lease. Plaintiff further argued that, although the legal effect of rewriting a new, enforceable lease would be a cancellation of the old lease, if agreed to by the parties, the court had ruled that this did not happen, due to the Statute of Frauds. Plaintiff maintained that, in any event, its "admission" relating to cancellation was, if anything, a conclusion of law and not a statement of fact. The court, stating that it believed that plaintiff had made a binding judicial admission, granted defendants' motion to dismiss. Plaintiff now appeals both from the order of July 31, 1987, granting summary judgment in favor of defendants on plaintiff's claims arising from the 1984 lease, due to the Statute of Frauds, and from the order of May 16, 1988, dismissing plaintiff's second amended complaint with prejudice.

OPINION

We first address the trial court's order granting summary judgment to defendants on the ground that the 1984 lease is unenforceable due to the Statute of Frauds. In order to determine whether the trial court's ruling was correct, it is necessary to enumerate the collateral writings submitted in evidence of the contract.

In addition to the unsigned lease itself, which clearly sets forth in detail the names of the parties, a description of the property, the amount of rent, and various other terms of the agreement, the plaintiff submitted a number of other writings which, it contends, evidence an enforceable agreement within the Statute of Frauds. Among these are 13 cancelled checks, including: (1) 10 monthly checks for $3,000, beginning with a check dated April 16, 1984, and ending with a check dated August 8, 1985; (2) a check dated December 18, 1984, in the amount of $9,000; (3) a check dated January 7, 1985, in the amount of $3,742.31; and (4) a check dated August 21, 1985, in the amount of $1,347. All of the above-mentioned checks were drawn on the account of "Mandas Snack Shop, 1457 Ellinwood St[reet], Des Plaines, Illinois," and were made payable to "Maridem Property," as required by the express written terms of both the 1980 and 1984 leases. All contain a printed line stating "Mandas Snack Shop," immediately above the line for the drawer's signature. The signature line of every check is signed by "Bill Mandas." No check is signed by Peter Mandas.

Another document submitted by plaintiff is a letter, dated October 3, 1984, addressed to Peter Mandas at the Mandas Snack Shop, and signed by Philip Prassas, which reads in part:

"Dear Peter:

This is a follow-up to my letter of September 14, 1984. It also serves as a ten (10) day notice of eviction if you fail to meet

your obligations under our lease. To date, you owe the following:

| | |
|---|---|
| September Rent: | $3,000.00 |
| October Rent: | 3,000.00 |
| 1983 Real Estate Tax Reimbursement | 1,742.31 |
| Total Due | $7,742.31 |

Additionally, you are to provide me with written documentation for the following insurance coverage:

    a) Fire extinguisher system with a service contract

    b) Co-insurance in the amounts indicated in your lease ***

If I do not receive all of this by October 15, I shall be forced to take appropriate legal action."

Also submitted into evidence was a handwritten note, dated "12-28-84," addressed to "Mr. Prassas" and signed by Bill Mandas, which states in pertinent part:

"Enclosed is a check in the amount of $9,000.00 certified. We appreciate your patience and please give us a little longer and we will pay the balance of $4,742.31 soon."

Another letter, dated July 1, 1985, and typewritten on the letterhead stationery of Philip G. Prassas, but unsigned, is captioned "Delinquent Account." It is addressed to Bill Mandas at the Mandas Snack Shop and reads:

| | |
|---|---|
| "Balance of Reimbursement of 1983 Real Estate Taxes | $1,000.00 |
| Reimbursement of Plate Glass Insurance | 347.00 |
| | $1,347.00 |

Please make check payable to MARIDEM PROPERTY."

In addition to the above correspondence, there is the termination notice which plaintiff alleges was attached to the 1984 lease when served on Philip Prassas. It states:

"NOTICE OF TERMINATION OF TENANCY

| To: La Salle National Bank | To: The Beneficiaries of |
|---|---|
| 135 South La Salle Street | Trust No. 36680, La Salle |
| Chicago, IL 60690, not | National Bank as |
| individually, but as | Trustee, Philip G. |
| Trustee of Trust No. | Prassas, Agent |
| 36680 | 823 Westwood Lane |
| | Wilmette, IL 60091 |

You are hereby notified that Peter Mandas, Bill Mandas, Stella Mandas d/b/a The Mandas Snack Shop, 1457-1459 Ellinwood Avenue, Des

Plaines, Illinois, due [*sic*] hereby elect to terminate their tenancy of the premises located at 1457-1459 Ellinwood Avenue, Des Plaines, Illinois on the 31st day of August, 1985. You are hereby notified that the Lessees do intend to surrender possession of said premises to you the Lessor on that day.

Dated at Des Plaines, Illinois this 29th day of July, 1985.

LaSUSA & STORINO, LTD., as

attorneys and agents for the Lessees.

By Samuel A. LaSusa /s/

SAMUEL A. LASUSA

CERTIFIED MAIL—RETURN RECEIPT REQUESTED."

The final document presented in support of the 1984 lease is the July 14, 1987, sworn "affidavit of Philip G. Prassas," which states that (1) the defendants, Peter and Bill Mandas, were tenants of the premises for 26 years; (2) during that time, the defendants occupied the premises under the terms of various written lease agreements negotiated by Philip Prassas; (3) on or about July 11, 1979, a written lease agreement was entered into between plaintiff and defendants, although it was never executed; (4) on October 1, 1980, plaintiff and defendants agreed to rewrite the 1979 lease agreement and executed a new lease commencing October 1, 1980, through September 30, 1985; (5) on or about March 1, 1984, at the request of defendants, plaintiff agreed to rewrite the October 1, 1980, lease; and (6) although the 1984 lease was never executed, defendants occupied the premises "under the terms of this agreement" for 17 months, communicated with plaintiff relative to performance under its terms, made payments by check for "rent, taxes and insurance due under the terms of the [1984] lease," and served notice on plaintiff "terminating its contractual commitment and attached to said notice a copy of the [1984] lease agreement."

Plaintiff contends that in reaching its decision, the trial court viewed each of the collateral documents individually, rather than comprehensively. It argues that a decision based primarily on the fact that the 1984 lease was unexecuted, without an evidentiary hearing to establish the entire context of these writings and their legal effect, was premature. In order to decide what we view as a close question under the facts, we must begin with the applicable rules and standards governing summary judgment motions and the Statute of Frauds, proceeding to a discussion of the writings submitted by plaintiff in the context of these principles.

■■■ The purpose of summary judgment is to determine whether any issues of material fact exist. (*Brewer v. Daubert Chemical Co.*

(1979), 72 Ill. App. 3d 718, 722, 391 N.E.2d 110, 114.) Summary judgment is proper where the pleadings, depositions and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c); *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 793, 450 N.E.2d 1286, 1289.) Where a motion for summary judgment in a contract action does not raise a question of fact, the court may consider the legal question of whether there is a valid contract to be enforced. *Brewer*, 72 Ill. App. 3d at 722, 391 N.E.2d at 114.

■■ ■ While summary judgment is recognized as a salutary procedure in the administration of justice, it must be cautiously granted so that respondent's right to trial is not usurped in the presence of material evidentiary conflicting facts and inferences. The function of the procedure is to determine the existence or absence of triable issues of fact, not to try them. (*Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 423, 466 N.E.2d 1271, 1274.) In considering a motion for summary judgment, the trial court must construe the pleadings, depositions, and affidavits most strictly against the moving party and most liberally in favor of the opponent. (*Estate of Kern*, 115 Ill. App. 3d at 793, 450 N.E.2d at 1289.) It has been held that the moving party for summary judgment must affirmatively show a clear legal right thereto, free from doubt. If any facts upon which reasonable persons may disagree are identified, or inferences may be fairly drawn from those facts leading to differing conclusions, the circuit court must deny the motion and direct the resolution of those facts and inferences be made at trial. *Montes*, 126 Ill. App. 3d at 423, 466 N.E.2d at 1274.

■■■ Nonetheless, because summary judgment motions are intended to pierce the pleadings and test whether the pleadings raise factual issues which warrant a trial, their resolution must be based on evidentiary facts, not on the allegations of the pleadings. (See *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.) If the movant is a defendant, as in the instant case, the materials need only establish the defendant's factual position on the affirmative defense raised. (See *Abel v. General Motors Corp.* (1987), 155 Ill. App. 3d 208, 507 N.E.2d 1369.) Once the movant has carried this burden, the respondent may not rely on the factual issues raised by the pleadings, but must submit affidavits or refer to depositions or admissions on file which present a contrary version of the facts. (*Carruthers*, 57 Ill. 2d at 380, 313 N.E.2d at 459.) While parties opposing a summary judgment motion are not required to prove their case,

they are under a duty to present a factual basis which would arguably entitle them to judgment in their favor, based on the applicable law. (*Yusuf v. Village of Villa Park* (1983), 120 Ill. App. 3d 533, 540, 458 N.E.2d 575, 581; *Martin v. 1727 Corp.* (1983), 120 Ill. App. 3d 733, 737, 458 N.E.2d 990, 992.) Our supreme court has articulated the standard for determining whether there is a genuine issue of material fact which would preclude the entry of summary judgment:

> "[I]f what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered." (*Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500.)

The general rule governing directed verdicts is well settled. A verdict should not be directed unless all the evidence, when viewed in its aspect most favorable to the party opposing the motion, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) Appellate court decisions, following *Fooden*, have adopted the directed verdict standard as the proper test for courts to use in resolving summary judgment motions. (See, *e.g., Elsa Benson, Inc. v. Kalman Floor Co.* (1989), 191 Ill. App. 3d 1016, 548 N.E.2d 485; *Holbrook v. Peric* (1984), 129 Ill. App. 3d 996, 473 N.E.2d 531; *Thompson v. Platt* (1983), 116 Ill. App. 3d 662, 452 N.E.2d 733; *Murphy v. Ambassador East* (1977), 54 Ill. App. 3d 980, 370 N.E.2d 124; see generally R. Michael, 4 Illinois Practice, Civil Procedure Before Trial §§ 38.5, 40.2 (1989).) On appeal, the reviewing court must consider all grounds and facts urged below (*Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 741, 415 N.E.2d 434, 440) and will reverse an order granting summary judgment if it determines that a material question of fact exists and that the moving party is not entitled to judgment as a matter of law (*Estate of Kern*, 115 Ill. App. 3d at 793, 450 N.E.2d at 1289).

▮ The trial court, after considering the pleadings, affidavits, and documents submitted by the parties, concluded that the 1984 lease was never executed by either plaintiff or defendants and that the written memoranda relied upon by plaintiff were insufficient to satisfy the Statute of Frauds. Therefore, the 1984 lease was deemed unenforceable. The Bank concedes that unless the full performance doctrine or other equitable considerations preclude its application, the unexecuted five-year lease is within the Statute of Frauds, which pro-

vides in relevant part:

"No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the parties to be charged therewith, *or some other person thereunto by him lawfully authorized in writing*, signed by such party." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 59, par. 2.

■■■ It is well established that the Statute of Frauds applies to a lease for a term of more than one year. (*Fischer v. Mann* (1987), 161 Ill. App. 3d 424, 428, 514 N.E.2d 566, 569; *Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 366, 390 N.E.2d 417, 422.) Illinois law regarding the Statute of Frauds in relation to such leases was summarized in *Daehler* as follows:

"In order to satisfy the Statute of Frauds, a lease for a term of more than one year or a memorandum thereof must be in writing and contain the names of the parties, a description of the property sufficient enough to identify the property, the amount of rent, and the term of the lease. The writing must also have been signed by the party to be charged, or by some other person authorized by him in writing. [Citations.] It is not necessary that a lease or a memorandum thereof be in one writing, as it may be gathered from several writings taken together, including letters between the parties. [Citations.] However, to establish a lease or memorandum thereof from more than one writing, only one of which has been signed, the signed writing *'must refer expressly to the other writing, or the several writings must be so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract.'* [Citation.]" (Emphasis added.) *Daehler*, 72 Ill. App. 3d at 366, 390 N.E.2d at 422, as quoted in *Fischer v. Mann*, 161 Ill. App. 3d at 428, 514 N.E.2d at 569.

We have carefully examined all of the collateral writings considered by the trial court and must agree with its finding that no obvious internal references to the 1984 lease may be discerned from the face of any of them. Of course, the cancelled checks refer to the specific property named in that lease, as do both letters sent by Prassas to Bill Mandas regarding delinquent payments and the termination notice mailed to Prassas by defendants' "attorney and agent." However, because the identical property is involved whether the defendants were operating under the 1984 lease, the 1980 lease, or, as they al-

lege, under an oral lease for a flat rental fee of $3,000 per month, the very specific references to the rental property in these writings do not aid the Bank's position as they would in the vast majority of cases involving real estate transactions within the Statute of Frauds. Nor have we been able to find a distinguishing feature, such as a trust number, billing address, or the like, in the seven pages of the unexecuted lease, to which a feature of one or more collateral documents could be matched, revealing that the person who prepared and signed the collateral writing could only have been communicating in reference to the 1984 agreement, and no other. In *Hartke v. Conn* (1981), 102 Ill. App. 3d 96, 102, 429 N.E.2d 885, 890, the court found that a notice to quit certain farmland, signed by the landlord's agent and stating an intention to terminate "the lease," contained the identical factual errors in the property description as were found in a specific written lease, thus indicating an unmistakable reference to that unsigned agreement. In the instant case, we are unable to find a similar distinguishing characteristic enabling us to reach the same conclusion.

Furthermore, as the trial court noted, none of the checks or letters includes the signature of Peter Mandas, one of the parties to be charged under the 1984 lease. Nor does a reference to any "lease" appear on any of the checks. In fact, the only reference to a lease agreement between the parties, other than those in the unexecuted contract itself, are in a letter prepared and signed by plaintiff's agent. These are general references to "your obligations under our lease" and "co-insurance in the amounts indicated in your lease," and were made by a person who admittedly dealt with defendants under prior leases, including the 1980 lease, involving the identical property.

■■ While it is readily apparent that none of the collateral writings "refer expressly" to the unsigned writing (1984 lease), a sufficient memorandum of a lease may also be established from several writings which are "so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract." (*Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 366, 390 N.E.2d 417, 422.) The key concepts in this well-established rule, as applied to the 1984 lease, are "connected, either physically or otherwise," "by internal evidence," and "same contract." It is also essential, in order to satisfy the minimum requirements of the statute, that the "signed writing" be signed either by the persons to be charged, or by an agent authorized by them, in writing.

■■ ■ With respect to these factors, the Bank has repeatedly asserted in verified pleadings and through supporting affidavits that the "Notice of Termination of Tenancy," which was apparently exe-

cuted by defendants' "attorney and agent," was served on plaintiff's agent, physically attached to a copy of the 1984 lease. We find no evidence in the record on appeal which rebuts or disproves the specific allegation of physical attachment. We also recognize the well-settled principle of contract law which holds that the Statute of Frauds may be satisfied by a signed writing which is not made as a memorandum of the contract. In fact, a "signed writing which is otherwise a sufficient memorandum of a contract is not rendered insufficient by the fact that it also repudiates or cancels the contract," although "a writing denying the making of the contract is not a memorandum of it." (Restatement (Second) of Contracts §133 (1981).) Accordingly, the critical questions become (1) whether the termination notice is sufficient as a "signed writing" of the defendants, and (2) if so, whether this document, if actually served on plaintiff with the 1984 lease attached to it, sufficiently acknowledged and relied upon that lease so that "[t]he two, taken together, satisfy the statutory requirements of a signed memorandum indicating the contract." See *Hartke v. Conn* (1981), 102 Ill. App. 3d 96, 103, 429 N.E.2d 885, 890-91.

The unavoidable conclusion is that these two documents, however physically attached and with or without the other writings, do not suffice as a signed memorandum of the 1984 lease. They cannot comprise a signed writing which is a sufficient memorandum of that agreement in the absence of the required authorization, in writing, of defendants' "attorney and agent" to terminate or cancel, and thereby acknowledge, the 1984 lease by mailing the July 29, 1985, termination notice. Illinois courts have strictly enforced the requirement that the agent of the party to be charged be authorized in writing to enter into or acknowledge a contract within the statute. (See, *e.g., Intini v. Marino* (1983), 112 Ill. App. 3d 252, 255, 445 N.E.2d 460, 463; *Flannery v. Marathon Oil Co.* (1979), 75 Ill. App. 3d 690, 693-94, 394 N.E.2d 706, 709; *Besinger v. National Tea Co.* (1971), 1 Ill. App. 3d 589, 594, 275 N.E.2d 226, 230.) Of course, this requirement may also be met where the signer of a collateral document acknowledging or relying on a lease was acting as defendant's agent in preparing that signed writing, which was also intended by defendant to terminate the written but unexecuted lease, and the fact of agency was admitted in open court by the person to be charged. (*Hartke v. Conn* (1981), 102 Ill. App. 3d 96, 102, 429 N.E.2d 885, 890.) However, in the case at bar, the bank has nowhere alleged that such written authorization existed or could be produced, or that such an admission has been made or would be made at trial.

The statute also requires that the signed and unsigned writ-

ings must be shown to be so connected that it may be determined by *internal evidence* that they relate to the *same contract.* (*Western Metals Co. v. Hartman Ingot Metal Co.* (1922), 303 Ill. 479, 483, 135 N.E. 744, 746; *Shugan v. Colonial View Manor* (1982), 107 Ill. App. 3d 458, 465, 437 N.E.2d 731, 737.) The rule is that parol evidence, to establish the handwriting of the party to be charged or the circumstances surrounding the making of the memorandum, may be used to bring the writings together, as long as the connection between them is shown by internal evidence. *Shugan,* 107 Ill. App. 3d at 465-66, 437 N.E.2d at 737; see also *Crabtree v. Elizabeth Arden Sales Corp.* (1953), 305 N.Y. 48, 110 N.E.2d 551 (permitting parol evidence where the unsigned document on its face referred to the same transaction as that set forth in the document signed by the party to be charged); *Douglas v. Texas-Canadian Oil Corp.* (1943), 141 Tex. 506, 174 S.W.2d 730 (explaining the general rule that mere physical connection between two or more instruments, without facial reference to the same transaction, is insufficient to warrant their consideration as a memorandum under the statute).

We have carefully scrutinized the other writings submitted by plaintiff and have also found them wanting as a sufficient memorandum of the unexecuted 1984 lease. We acknowledge that a reasonable inference could be drawn from the letters sent by Prassas to the defendants, referring to insurance and tax reimbursement obligations under "our lease," and from the checks paid by defendants in amounts other than $3,000, that defendants were, in fact, occupying the premises between April 1984 and September 1985 under the specific terms of a written lease, either the 1980 or 1984 agreement, and not under an oral lease for a flat $3,000 monthly rental fee, as they have alleged in pleadings and in oral argument before this court. However, there is nothing which indicates that the 1983 tax obligations or the co-insurance amounts requested were referencing the 1984 lease. In fact, the 1983 real estate tax reimbursement could easily refer to an amount still unpaid under the terms of the 1980 lease. All that is reasonably certain is that checks were paid to Prassas, in amounts other than $3,000, and that Bill Mandas believed that these amounts were due and owing to Prassas in fulfillment of certain Mandas Snack Shop obligations. From neither the checks nor the correspondence can it be determined from internal evidence that both relate, specifically, to the 1984 unexecuted lease and to no other agreement. Moreover, while the printed format of the checks, indicating that the monies were paid from a business account in the name of "Mandas Snack Shop" and the reference to defendants, in the no-

tice terminating tenancy, as "d/b/a Mandas Snack Shop," imply the possibility of a partnership, and thereby, an agency relationship between the two defendants in the conduct of matters relating to their business, the Bank has nowhere alleged such a relationship or offered deposition or other evidence establishing one, and this court will not engage in speculation about mere possibilities. We further observe that in cases involving unexecuted lease agreements and checks paid in fulfillment of specific contractual terms of those agreements, the result has been favorable to the plaintiff where the checks could be identified to the contracts by internal evidence and where there was also a signed writing by both defendants. (See *Jones v. Olsen* (1980), 80 Ill. App. 3d 1016, 400 N.E.2d 665.) However, where these requirements were not met, the purported agreement has been held unenforceable. See *Fischer v. Mann* (1987), 161 Ill. App. 3d 424, 514 N.E.2d 566.

■■ With respect to plaintiff's burden to bring forth sufficient documentation to evidence an enforceable agreement within the statute, we note that the Bank has had more than adequate time to conduct discovery which might enable it to meet these requirements. This lawsuit was brought, solely on the basis of an admittedly unexecuted lease, nearly two years before the trial court's order granting summary judgment to defendants. Between the commencement of the suit and defendants' motion based on the Statute of Frauds, filed more than 21 months later, plaintiff took the discovery deposition of defendant Peter Mandas on March 31, 1986, only two pages of which are included in the record on appeal. The notice of deposition to defendants' attorney also requested production of "any and all written documentation, memoranda, correspondence, communications, and contracts between Plaintiff and Defendant dealing with the issues raised" in the case. Furthermore, it is reasonable to assume that, throughout the two years of discovery and other proceedings, the Bank had access to the files of its agent, Prassas, and to any and all records and documents retained in those files relating to his dealings with the defendants. The Bank also could have initiated further discovery of either defendant and could have supported its own position with deposition testimony.

■■ Moreover, the parties are bound by the procedural rules governing summary judgment motions. We find no indication in the record that the Bank either requested additional time to conduct discovery after defendants filed their motion or invoked Supreme Court Rule 191(b), which provides:

"If the affidavit of either party contains a statement that any

of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing papers or documents in the possession of those persons or furnishing sworn copies thereof. The interrogatories and sworn answers thereto, depositions so taken, and sworn copies of papers and documents so furnished, shall be considered with the affidavits in passing upon the motion." (107 Ill. 2d R. 191(b).)

Accordingly, we can only conclude that the trial court's determination was fairly based on the pleadings, affidavits, and other supporting documents which the parties brought forward for its consideration.

■■■ This is, admittedly, a close case under all the facts, and it is open to speculation whether the parties were in actuality operating under the terms of the 1984 lease. Nonetheless, the ultimate question before this court is whether, having construed the pleadings, affidavits, and other documents most strictly against the defendants and most liberally in favor of plaintiff, the defendants have shown a clear legal right to summary judgment, based on the affirmative defense of the Statute of Frauds. Applying the relevant substantive law in the context of the applicable standards and procedural rules, we must conclude that the Bank has not met its burden of presenting a factual basis which would arguably entitle it to judgment in its favor, based on the applicable law. Instead, applying the *Fooden* standard, we can state with certainty that, if the evidence presented constituted all of the evidence before the court as to sufficiency of the 1984 lease as a signed writing within the statute, no verdict in favor of the Bank, based on a claim under that agreement, could possibly stand. As Corbin has stated in reference to the sufficiency of a signed writing which will preclude the operation of the statute:

"All that is required is that these writings shall so clearly evidence the fact that a contract was made, and what are its terms, that there is no serious possibility that the assertion of the contract is false." (2 Corbin on Contracts §512, at 744-45 (1950), quoted in *Mid-Town Petroleum, Inc. v. Dine* (1979), 72 Ill. App. 3d 296, 305, 390 N.E.2d 428, 435.)

The trial court correctly determined that the writings placed before it did not meet this requirement.

■■■ Furthermore, the trial court properly found that neither equitable doctrines nor considerations of fundamental fairness operated to bar the application of the statute. The Bank argues that the court failed to take into account the 26-year contractual relationship between the parties and its own performance in reliance on the unexecuted lease. It observes that the courts of this State have "long recognized the inequity of allowing one to utilize the Statute of Frauds to work an injustice or fraud, and ha[ve] refused in such cases to permit its assertion as a defense." (*Loeb v. Gendel* (1961), 23 Ill. 2d 502, 505, 179 N.E.2d 7, 9.) However, this doctrine does not extend so far as to label as fraud or bad faith the mere use of the statute as an affirmative defense in a contract action. As our supreme court has also stated:

> "The moral wrong alone of refusing to be bound by an agreement because it fails to comply with the statute does not suffice to estop a defendant from asserting the statute as a defense." (*Loeb*, 23 Ill. 2d at 504, 179 N.E.2d at 8.)

If this were not the rule, the effect would be to nullify the statute and open the door to frauds it is intended to prevent. *Davito v. Blakely* (1968), 96 Ill. App. 2d 196, 201, 238 N.E.2d 410, 413.

■■■ ■ Nor, under the facts of this case, should the full performance doctrine operate to remove the unexecuted lease from the statute. As previously explained by this court:

> "The rationale of the full performance doctrine is that when one party, in reasonable reliance on the contract, performs all of its obligations, it would be unfair to allow the other party to accept the benefits under the contract but to avoid its reciprocal obligations by asserting the Statute of Frauds. [Citation.] Illinois courts have uniformly followed the rule, *** that when one party to a contract completes his performance, the one-year provision of the statute does not prevent enforcement of the promises of the other party. [Citations.]" (*American College of Surgeons v. Lumbermens Mutual Casualty Co.* (1986), 142 Ill. App. 3d 680, 700, 491 N.E.2d 1179, 1193.)

Here, the full performance doctrine does not apply because neither party completed its performance under the terms of the 1984 lease, which was to run for five years until 1989, or at least until the condemnation judgment against the property in March 1987. Plaintiff collected rent and other fees, under the terms of one or more oral or written leases, through August 1985, while at the same time making

its property available to the defendants, who were compensating plaintiff for the privilege. This does not constitute full performance under the five-year 1984 lease and does not remove that lease from the protection of the statute. Therefore, the enforceability of the 1984 lease depended upon its meeting the requirements of the statute, which it cannot satisfy. Accordingly, the trial court correctly granted summary judgment in favor of the defendants as to the Bank's original complaint, which was entirely based upon a purported contract which was unenforceable against them.

■ Turning next to the trial court's order dismissing with prejudice the Bank's second amended complaint, which was based on the 1980 lease, we arrive at the opposite conclusion, for reasons which follow. Defendants' motion to dismiss was made pursuant to section 2—619(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(9)), which involves motions which raise affirmative matter avoiding the legal effect of or defeating the claim. If a critical issue of material fact is refuted by the affirmative matter, a motion made pursuant to section 2—619(a)(9) may be granted. (*Palmisano v. Connell* (1989), 179 Ill. App. 3d 1089, 1097, 534 N.E.2d 1243, 1249; *Ralston v. Cassanova* (1984), 129 Ill. App. 3d 1050, 1056, 473 N.E.2d 444, 448.) In the case at bar, the affirmative matter relied upon by defendants was certain allegations in the Bank's original verified complaint, stating that the plaintiff and defendants agreed to write a new lease, "thereby cancelling" the 1980 lease, and that defendants thereafter occupied the premises under the 1984 lease. In ruling on the motion to dismiss the second amended complaint, the trial judge found that these statements, appearing in all of the Bank's previously filed verified complaints relying on the 1984 lease, were binding judicial admissions. The court therefore held that the 1980 lease was, in fact, cancelled, and that the Bank could not pursue a claim against defendants based on the 1980 lease, despite the unenforceability of the 1984 lease and despite the reverse option clause in the 1980 lease. The reverse option clause, as previously noted, provided for automatic renewal of the 1980 lease for an additional five-year term, until 1990, unless defendants followed a very specific notification procedure, which the sworn affidavit of Philip Prassas indicates they did not follow.

■ It is well established that a fact admitted in a verified pleading is a formal, conclusive judicial admission which is binding on the pleader and which dispenses wholly with proof of that fact. (*Beverly Bank v. Coleman Air Transport* (1985), 134 Ill. App. 3d 699, 703, 481 N.E.2d 54, 57; *Chavez v. Watts* (1987), 161 Ill. App. 3d 664,

672-73, 515 N.E.2d 146, 152.) The Bank's original verified complaint contained the following allegations: (1) that "[o]n or about the first of March, 1984 Plaintiff, through its agent, and at Defendant's request, agreed to rewrite Defendant's lease agreement, *thereby cancelling* the balance of the existing lease agreement" (emphasis added); and (2) that "[d]efendants occupied [the] premises under the terms of [the new lease agreement] from April 1, 1984 through August 31, 1985, a period of seventeen (17) months." As a general rule, an amended pleading, such as the Bank's second amended complaint, supersedes the prior pleading. However, where the original pleading is verified, it remains part of the record upon the filing of an amended pleading (*Yarc v. American Hospital Supply Corp.* (1974), 17 Ill. App. 3d 667, 670, 307 N.E.2d 749, 752), and any admissions in the original verified pleading which were not the product of mistake or inadvertence are binding judicial admissions which remain binding on the pleader even after amendment (*American National Bank & Trust Co. v. Erickson* (1983), 115 Ill. App. 3d 1026, 1029, 452 N.E.2d 3, 6). The Bank has not claimed that its original statements relating to a cancellation of the 1980 lease were a product of mistake or inadvertence, and nothing in the record would so indicate. Therefore, these statements, if correctly found to constitute judicial admissions, would be determinative of whether the Bank could state a cause of action for breach of the 1980 lease.

▮▮ "Prior inconsistent sworn statements," or judicial admissions, are a party's formal binding statements or allegations of fact. (*Giamanco v. Giamanco* (1982), 111 Ill. App. 3d 1017, 1022, 444 N.E.2d 1090, 1093-94.) Once made, as for example in a verified pleading, a party cannot subsequently contradict such factual allegations. (*Premier Electrical Construction Co. v. La Salle National Bank* (1984), 132 Ill. App. 3d 485, 494, 477 N.E.2d 1249, 1256.) However, it is well settled that the provision in section 2—605 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—605), that verified allegations shall not constitute evidence except by way of admission, refers to admissions of fact, not allegations of legal conclusions or admissions of law. *Premier Electrical Construction Co.*, 132 Ill. App. 3d at 494, 477 N.E.2d at 1256; *Franz v. Schneider* (1957), 14 Ill. App. 2d 464, 468, 144 N.E.2d 798, 800.

▮▮ Applying these principles to the statement in plaintiff's original verified complaint that through its agent, and at defendants' request, it "agreed to rewrite" defendants' prior lease agreement, "thereby cancelling" the balance of the existing lease agreement, we must ultimately conclude that this statement is an allegation of a legal

conclusion rather than a binding admission of fact. Admittedly, the instant case does not present a clear-cut example of either a concrete fact within the pleader's personal knowledge (see, *e.g., Giamanco v. Giamanco* (1982), 111 Ill. App. 3d 1017, 1022, 444 N.E.2d 1090, 1091-92 (where defendant answered a complaint for modification of a divorce decree to increase maintenance by admitting his "financial ability to pay in this cause")), or an obviously unwarranted and erroneous legal conclusion (see, *e.g., Franz v. Schneider* (1957), 14 Ill. App. 2d 464, 468, 144 N.E.2d 798, 800 (where the court held that defendants could not be bound by the statement that they were liable for a share of the Illinois inheritance tax under a certain will)). However, considering plaintiff's words in the context of the entire allegation and the entire complaint, we cannot characterize them as a judicial admission that the 1980 lease was, in fact, "cancelled" as of March or April 1984.

First, we note the relationship between the terms "rewrite" and "thereby cancelling" which is apparent from the grammatical construction of the Bank's allegation. At the very least, one reasonable inference is that another written, enforceable lease would take the place of the 1980 lease, "thereby cancelling" the provisions of the prior agreement for the rest of the term. The only other interpretation would require an assumption that the lessor intended to entirely cancel the 1980 lease, and to release defendants from any remaining obligations under that signed instrument simply by entering into negotiations with defendants for some new terms, or by preparing the draft of a new written instrument which may never have been accepted or executed by defendants, or become enforceable against them. This reading of plaintiff's allegation would best be characterized as an erroneous conclusion of law. Moreover, it is belied by certain new terms in the 1984 lease, which was attached to the verified complaint. These terms call for the tenants to undertake immediate remodeling and upgrading of the premises "[i]n consideration of the Lessor giving Lessee a flat-rate gross rent and the elimination of a CPI rental adjustment." Thus, the most reasonable inference to be drawn from the allegation in the Bank's original complaint is that the consideration for cancelling the prior executory lease, 17 months before its term would otherwise end, was to be the "rewriting" of an enforceable new lease.

Even if considered in a light more favorable to defendants, the Bank's statement about "rewriting" and "thereby cancelling" the prior agreement must at least be characterized as ambiguous. In an earlier appellate decision, a third-party corporate defendant was found

to have made a judicial admission of fact where it admitted, both in verified pleadings and through in-court statements, that certain provisions of a letter, signed by its agent, were a binding supplement to, and part of, a written service contract. (*Wiegel v. One La Salle Co.* (1966), 75 Ill. App. 2d 272, 221 N.E.2d 117.) In *Wiegel*, where the unequivocal testimony and verified pleadings amounted to an admission of the entire contract by the corporation, the court would not permit it to later claim that the supplementary provisions were void for lack of consideration. However, in so holding, the court further stated:

> "Had the third party defendant [Otis Elevator Company] made some showing that there was ambiguity in his statement or answer or that the statement or answer on its face permitted conflicting inferences, then the contention of Otis would have more validity." (*Wiegel*, 75 Ill. App. 2d at 276, 221 N.E.2d at 119.)

As explained above, the Bank's allegations relating to the 1980 lease are both facially ambiguous and subject to conflicting inferences. For this reason as well, the Bank should not be bound to them on a motion to dismiss, thus precluding the taking of further evidence and any possibility of recovery.

Moreover, a conclusion favoring plaintiff's position is supported by the trial court's earlier ruling denying the Bank's own motion for summary judgment, which was based on the 1980 lease and its reverse option clause. That order specifically stated that the motion was denied because "there exist[ed] material issues of fact." We entirely agree. We also believe that there remain, at this juncture, material issues of fact pertaining to the possibility of liability and/or claims under the 1980 lease. In its verified second amended complaint, the Bank alleges that, pursuant to the Consumer Price Index (CPI) clause in the 1980 lease, "the base monthly rental installments of $2,500.00 were adjusted after September 30, 1981 *** for the life of the lease and any extension thereof." Thus, there are conflicting allegations, in the various pleadings and affidavits filed by the parties, as to the amount of monthly rent actually paid by defendants immediately prior to April 1984, as to the reason why the defendants "commenced paying" $3,000 per month at that time, and as to whether they were actually occupying the premises "under the terms of" the 1980 lease through August 1985, or under the terms of another agreement, and to what legal effect. We believe that further evidence is required before a final determination of the factual and legal issues raised can be fairly made.

For the above-stated reasons, we find that the allegations in the Bank's original verified complaint do not constitute a binding admis-

sion of fact that the 1980 lease was cancelled and that critical issues of material fact remain which were not refuted by the "affirmative matter" relied upon by defendants. Therefore, a dismissal of the Bank's second amended complaint, based on the 1980 agreement, is not proper on grounds that the Bank could never prove any facts to support its claims as therein stated. Accordingly, we must reverse the trial court's order dismissing that complaint with prejudice.

To summarize, the trial court's order of July 31, 1987, granting summary judgment to defendants on those claims based on the unexecuted 1984 lease, due to the Statute of Frauds, is affirmed. That agreement is within the statute and is unenforceable against defendants as a matter of law. However, the trial court's order of May 16, 1988, dismissing the Bank's second amended complaint with prejudice, is hereby reversed and the case remanded for trial of the unresolved factual and legal issues. Many such issues remain, as framed by the pleadings, including the defendants' verified answers and countercomplaint, and the affidavits and other documents of record. These issues include: (1) the validity, duration, and legal effect of the 1980 lease agreement and its reverse option clause; (2) the intent of the parties; (3) the existence, terms, and effect of an alleged oral agreement between the parties during the period from March 1984 through August 1985; (4) the possible creation of a month-to-month tenancy as a matter of law; and (5) questions relating to damages, including setoffs. A determination of these issues, and any others which may properly be presented, is the province of the trial court and a jury. This cause is therefore remanded for trial and for any further proceedings not inconsistent with this opinion.

Affirmed in part; reversed in part and remanded.

MURRAY and GORDON*, JJ., concur.

*Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time, Justice Joseph Gordon was designated the third member of the panel and has read the record and briefs and has listened to the oral argument tape.